IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 27, 2020 Session

**STATE OF TENNESSEE v. KELLY LEE PITTS**

**Appeal from the Criminal Court for Washington County**
**No. 44799    Stacy L. Street, Judge**

**No. E2019-01656-CCA-R3-CD**

The Defendant, Kelly Lee Pitts, was convicted by a jury of seven counts each of attempted first degree murder and possessing a firearm during the commission of or attempt to commit a dangerous felony.  Thereafter, the trial court imposed an effective fifty-one-year sentence.  On appeal, the Defendant contends that (1) there was insufficient evidence to support his convictions for attempted first degree murder, specifically, challenging the element of premeditation; (2) the trial court erred by imposing partial consecutive sentencing based upon the dangerous offender criterion; (3) and the trial court erred in imposing Class C felony convictions for employing a firearm during the commission of or attempt to commit a dangerous felony when he was convicted only of possessing such a firearm, a Class D felony.[1]  The State concedes that the sentences and judgments for employment of a firearm were in error, and we agree.  In all other respects, we affirm.  Accordingly, though we affirm the Defendant's convictions, we vacate and modify certain judgment forms and sentences consistent with this opinion.  The case is remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court**
**Affirmed in Part; Modified in Part; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Patrick G. Frogge, Executive Director, District Public Defenders Conference (on appeal); and Jeffery C. Kelly, District Public Defender, and Melanie Sellers, Assistant District Public Defender (at trial), for the appellant, Kelly Lee Pitts.

---

[1] For the sake of clarity, the Defendant's issues have been reordered from how they appear in the Defendant's appellate brief.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Anthony Wade Clark, District Attorney General; and Dennis D. Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

This case involves the Defendant's allegedly firing shots from his bedroom window at four police officers and three bystanders who were standing outside his mobile home on December 16, 2015. On May 4, 2016, the Defendant was charged with seven counts of attempted first degree murder in violation of Tennessee Code Annotated section 39-12-202, a Class A felony, and seven counts of "possessing a firearm during the commission or attempt to commit a dangerous felony by employing a firearm during the attempt to commit a dangerous felony" in violation of Tennessee Code Annotated section 39-17-1324(b), a Class C felony. Thereafter, a superseding indictment was returned on July 5, 2016, which amended one count of attempted first degree murder (Count 3) to attempted first degree murder resulting in serious bodily injury. The Defendant proceeded to jury trial on all charges.

The proof at trial established that on December 16, 2015, the Defendant and his long-time girlfriend, Brandy Hyder,[2] lived in a two-bedroom mobile home on Brandy's father's property in Elizabethton. The couple had recently moved to Tennessee from North Carolina. Though the Defendant worked every day when they lived in North Carolina doing "anything he could to make a dollar," the Defendant was unable to maintain steady employment in Tennessee, and he sometimes worked with Brandy's brother when "moving jobs" were available.

At the time of the offense, Brandy's brother, Jack Hyder, and Jack's girlfriend, Kayla Hardin, along with the couple's three young children, had been staying in the mobile home with the Defendant and Brandy. Jack and Kayla had been staying there for about two weeks because the electricity at their residence had been turned off due to non-payment. According to Brandy, Jack and Kayla originally were only supposed to stay for a weekend before having their power restored, but as Jack and Kayla lingered in the mobile home, their continued presence made the Defendant unhappy and stressed. Brandy indicated that the Defendant frequently told her that the couple needed to leave.

Thirty-seven-year-old Brandy testified that she and the Defendant had been together for approximately seventeen years prior to this incident and that during those years, she had seen the Defendant abuse alcohol and drugs, including marijuana, pain pills, and

---

[2] Because several of the witnesses share surnames, we will refer to them by the first names. We intend no disrespect in doing so.

- 2 -

cocaine. Brandy confirmed that once they returned to Tennessee, the Defendant sought treatment for his drug addiction at a Suboxone clinic. Brandy believed that the Defendant "self-medicate[d]" due to his tragic family history, as well as his history of anxiety and depression. Brandy told the jury that the Defendant had been suicidal before, but never violent. In addition, Brandy did not think that the Defendant had ever tried to hurt anyone other than himself prior to this episode.

Brandy confirmed that on the day prior to the shooting, December 15, 2015, the Defendant drank alcohol, snorted Xanax, and likely smoked marijuana. Brandy was unsure if the Defendant "ever slept that night . . . cause his nerves [were] tore up," explaining that the Defendant "might've passed out for an hour or two." When Brandy went to sleep that evening, the Defendant was still sitting on the edge of their bed listening to the radio.

According to Brandy, the next day, December 16, 2015, the Defendant spent most of the day in his bedroom drinking large cans of beer, except for when he left to buy more beer. Brandy said that in addition to drinking beer that day, the Defendant also snorted Suboxone and likely consumed Xanax and smoked marijuana. Brandy testified that the Defendant was particularly aggravated, ill, and grouchy that day. Brandy said that the Defendant eventually became so intoxicated from the mixture of drugs and alcohol that evening that she hid the car keys to prevent him from driving. Jack recalled, however, that the Defendant seemed normal during their interactions that day and that when he saw the Defendant that evening, the Defendant was able to walk normally.

That evening, Brandy and the Defendant began fighting, and at that time, Greg Hardin, Kayla's brother, was at the mobile home visiting. Greg testified that while he was conversing with Jack in the living room, they heard noises coming from the bedroom and that Brandy went to the bedroom to check on the Defendant. When Brandy and the Defendant began yelling, Greg and Jack went outside. Brandy recalled that inside the bedroom, the Defendant threw a plate at the door and broke a box fan. Brandy explained that the Defendant also crushed a metal trash can and broke a digital converter box that evening. After instructing the Defendant not to break her belongings and exchanging further words with him, Brandy returned to the living room. Apparently while this altercation was taking place, Kayla was asleep on the living room couch, and the children were playing in the house.

Five to ten minutes later, Brandy heard a round being chambered in a gun from inside the bedroom. Brandy testified that the Defendant usually kept guns in a locked bedroom closet in the mobile home and that the guns were usually kept unloaded, though the clips were stored loaded on a nearby shelf in the closet. When Brandy returned to the bedroom, she found the Defendant sitting on the bed with an AK-47 rifle in his mouth, and she thought the Defendant was going to kill himself. She was able to wrestle the rifle away from the Defendant, but he then pulled a .22-caliber pistol from his back pocket. Brandy

- 3 -

said that was the first time the Defendant had ever pointed a gun at her. According to Brandy, the Defendant put the pistol to her head, then pointed it at his head, switching back and forth repeatedly while yelling and cursing, "Which one? . . . You b---h. Me b---h. You b---h. Me b---h. You b---h. Me b---h."

When Greg and Jack heard "loud banging noises" coming from inside the trailer, they entered through the back door. They stood in the hall leading to the Defendant and Brandy's bedroom and were able to observe the commotion taking place between Brandy and the Defendant, including seeing Brandy's disarming the Defendant of the AK-47 and then the Defendant's pointing a handgun back and forth between his head and Brandy's. Greg testified that he heard the Defendant tell Brandy that he would kill her, as well as saying to Brandy, "That's okay, b---h." Jack testified that he pulled out the handgun that he carried in his waistband, though he did not shoot, fearing he would hit Brandy. Jack opined that the Defendant knew he was armed that day.

Jack described that the Defendant was acting "just crazy" at that point and that he had never seen the Defendant behave like that before. Jack also said that the Defendant was not calm or logical at the time of the incident. Jack confirmed that he had never previously seen the Defendant try to hurt Brandy. In addition, Jack confirmed that the Defendant often used drugs, sometimes smoking marijuana and snorting Xanax and Suboxone, and that he had probably supplied the Defendant with Xanax and Suboxone around the time of the incident.

Greg testified that during the commotion, Jack told him to go get Jack and Brandy's father Michael Hyder, who lived on the property across the street and "up the hill." Greg complied and went to the house and knocked on the back door. When Michael answered, Greg informed him that the Defendant was at the mobile home drunk and waving a gun around. Michael proceeded across the street to investigate, where he met Jack at the back door of the mobile home; Greg also returned to the mobile home. Upon speaking with Greg and Jack, they reported to Michael that the Defendant was inside drunk, acting "crazy as hell," waving a gun around, and breaking Brandy's belongings. Though Michael could not see inside the mobile home, Michael confirmed that he had never seen the Defendant act in a similar manner previously.

Shortly after Michael arrived, Brandy came out of the mobile home crying and visibly upset. Michael asked Brandy what she wanted to do, and she responded, "What choice do I have? He's d--n acting crazy with a gun[.]" Jack called the police and handed the phone to his father, and Michael gave the operator his name and location and reported that the Defendant was drunk and waiving a weapon around inside the mobile home. At the operator's direction, Greg went into the trailer, woke up Kayla, and gathered the children. Greg testified that as he did so, he heard the Defendant say to Brandy that "[t]he

- 4 -

law better not be coming." Greg, Jack, Kayla, and the children then went to Michael's house.

Within minutes of receiving the 911 call, Carter County Sheriff Dexter Lunceford, who was on his way home from his church's 7:30 p.m. service, arrived on the scene in an unmarked gray Dodge Charger; Sheriff Lunceford did not have his lights or siren activated at that time. Spotting Michael, who was standing at the top of the driveway outside the mobile home, Sheriff Lunceford parked and exited his vehicle and spoke with Michael. After exiting his vehicle, Sheriff Lunceford looked toward the mobile home and saw a man with a handgun standing in the doorway and arguing with a woman standing outside. Brandy explained that at this time, the Defendant came to the door of the mobile home and said, "You call the law on me b---h?" The Defendant slammed the door, and Brandy started walking toward Sheriff Lunceford, who had gone to his trunk to put on his vest and retrieve his shotgun. Sheriff Lunceford moved to the passenger side of his vehicle to speak with Brandy and Michael. While they were conversing, and after the Defendant had gone back inside the mobile home, a light in the Defendant and Brandy's bedroom was turned on briefly, before being turned off again. While the light was turned on, Sheriff Lunceford saw through the bedroom window a silhouette of a man holding a long gun and a pistol. At some point, Brandy asked of Sheriff Lunceford, "Please don't kill him. He's not in his right mind."

Within minutes, two other marked cruisers arrived at the scene. Carter County Sheriff's Deputy Jason Mosier arrived first. Deputy Mosier did not activate his police lights or siren as he approached the house; he pulled in behind Sheriff Lunceford's car. Next to arrive was Sergeant David Caldwell of the Carter County Sheriff's Department; Sergeant Caldwell testified that he was training Deputy Jenna Markland that day, who was a passenger in his vehicle. Sergeant Caldwell also did not activate his police lights or siren as he approached the house. Sergeant Caldwell recalled that after he parked, there were around fifteen to twenty yards "from the back of [his] car to the front of" Sheriff's Lunceford's. Sheriff Lunceford testified that it was dark outside, but that there were streetlights and the police vehicles were in a well-lit area.

Shortly after the bedroom light went off and the other officers had arrived on the scene, multiple shots were fired from the mobile home's bedroom window. Multiple witnesses said that there was an initial burst of gunfire, which was followed by a pause before a second round of gunfire. Michael recalled that the gunfire "[s]ounded like [someone took] a pack of firecrackers and li[t] them all at one time, pow, pow, pow, pow," that there was a pause, and then "pow, pow, pow again." Sheriff Lunceford deduced that the Defendant was firing a semi-automatic rifle, explaining that a semi-automatic rifle requires the shooter to pull the trigger to fire each round and that the rifle will only fire as fast as the shooter pulls the trigger.

Sheriff Lunceford took cover behind his rear tire as multiple projectiles hit his vehicle. Brandy stated that after hearing gunshots, she "took off running." Michael said that he "hunkered down" in the driveway about five or six feet from the road. As Brandy attempted to flee, she sustained a gunshot wound to her hand and a bullet graze to her stomach. Brandy fell to the ground and Greg, who had been walking from Michael's house down the driveway toward the mobile home when the gunfire began, went to help her. Greg recalled bullets hitting close by as he went to assist Brandy with taking cover. According to Greg, the bullets were "going everywhere," and several were definitely "going towards Brandy." Greg and Brandy laid down in the driveway to take cover from the first round of gunfire. During the pause in gunfire, Greg helped Brandy up and escorted her towards Michael's house. When the second round of gunfire began, Greg and Brandy hid behind Michael's truck, which was parked at the top of the driveway in front of Michael's house. Ultimately, Greg took Brandy inside Michael's house, where Jack washed Brandy's wound and tried to stop the bleeding. When Brandy's clothes were later examined, her shirt and hoodie had "two defects" reflecting that two bullets had passed through them.

Deputy Mosier testified that he had just stepped out of his patrol car when shots hit the driver's side of his vehicle. Deputy Mosier ran to the passenger side of his vehicle and took cover behind his rear tire. As he was taking cover, he could hear the glass in several of his windows shattering. Deputy Mosier had left his toboggan inside the vehicle on top of his rifle, which was mounted between the driver and passenger seats; Deputy Mosier described the toboggan's position as "pretty close to being right beside" where his head would have been had he been inside the vehicle. After the shooting, the toboggan had holes in it.

Relative to the third police vehicle on the scene, Sergeant Caldwell stated that he had opened his patrol car's door and was about "halfway" out of his car when he heard gunshots and saw Deputy Mosier's vehicle being hit by bullets. Sergeant Caldwell got out of his vehicle and ran around to the passenger side to take cover. Deputy Markland, who was still in the passenger seat of the vehicle when the shooting began, stated that as she tried to maneuver around the laptop equipment and get out of the vehicle, she felt something "like a grenade" explode on the right side of her face. Deputy Markland informed Sergeant Caldwell that she could not find her gun, so Sergeant Caldwell gave her his pistol and then leaned into his vehicle to unlock his shotgun and rifle. As Sergeant Caldwell leaned across the passenger seat to retrieve his rifle from its upright position between the front seats, a bullet passed through his driver's window and struck the rifle. The rifle was damaged somewhere between where the level of Sergeant Caldwell's head and shoulders would have been had he been seated in the car.

According to Deputy Markland, her face began feeling numb, and when she touched her face, her hand came back with a significant amount of blood on it. Deputy Markland relayed to Sergeant Caldwell that she had been shot. Sergeant Caldwell was able to see that Deputy Markland had a spot on her face that looked like a bleeding cut. In addition, Deputy Mosier observed that Deputy Markland had been shot and that her face was covered in blood. Deputy Markland also suffered a bullet graze wound to the left side of her head. At trial, Deputy Markland detailed her injuries and medical care for the jury.

Deputy Markland was able to exit the vehicle and took cover in the road. However, Sergeant Caldwell's radio was not working, so he directed Deputy Markland to get back inside the vehicle and radio dispatch. Deputy Markland's call for shots fired went out around 8:45 p.m.

When the second barrage of gunfire ended, Sheriff Lunceford feared that the Defendant had emptied his weapon and was only pausing to reload. So, Sheriff Lunceford fired one round into the mobile home's bedroom window where he had seen the silhouette.

Michael, realizing that his daughter and a police officer had both been shot, returned to his house and put Brandy in his truck to take her to receive medical attention. As Michael drove away with Brandy in the truck, Deputy Markland also jumped inside. According to Sergeant Caldwell, by this time, Deputy Markland's wound was about "tennis ball size" and her eye was swelling. Ultimately, Michael took both women to a nearby ambulance where paramedics began treating them.

Sheriff Lunceford, Deputy Mosier, and Sergeant Caldwell took cover in the ditch across the road from the mobile home until both the Elizabethton and Carter County SWAT teams arrived approximately thirty to forty-five minutes later. After the SWAT teams' arrival, tear gas was fired into the mobile home, but no one came out. After going inside, they were still unable to find the Defendant. Ultimately, the SWAT teams located the Defendant lying next to his rifle in a nearby cave. The Defendant was apprehended without incident between 3:00 and 3:30 a.m., and in addition to the rifle, the officers confiscated two handguns from the Defendant's person at that time.

The Tennessee Bureau Investigation ("TBI") Violent Crime Response Team assisted in processing the scene. In the Defendant and Brandy's bedroom, the team found two semi-automatic rifles on the bed, as well as a number of various caliber unfired rounds scattered throughout the room. When the team removed the clips from the rifles on the bed, the thirty and thirty-six capacity clips were empty. TBI Special Agent Michael Tiller collected fifty-two spent shell casings from the room, and subsequent testing revealed that those spent casings were fired from the two rifles on the bed. Photographs of the bedroom revealed at least two empty beer cans, and one can reflected that it contained twenty-five ounces; there was also a photograph of marijuana "rolling papers." In addition, it was also

determined that there were approximately seventeen points of impact to the three police vehicles on the scene; the trajectory of those bullets pointed towards the bedroom window. Finally, a bullet hole was found in Michael's detached garage, and Larry Hyder, who also had a home on the property, found multiple bullet holes in his garage.

TBI Special Agent Scott Lott interviewed the Defendant following the Defendant's arrest, and the interview began at 4:09 a.m. on December 17. The interview was recorded, and the audio recording was played for the jury. During the interview, the Defendant told Agent Lott that he and Jack had been arguing that day. The Defendant explained, "About thirty minutes after me and Jack [sic] quit arguing, some cars showed up outside. I saw the cars and figured it was the Sheriff's Department because they were Dodge Chargers." The Defendant also claimed that he thought the cars contained some of Jack's friends, who were there to hurt him because Jack had been threatening him. The Defendant denied aiming at the cars or trying to kill any of the alleged victims. The Defendant indicated that he shot his AK-47 out the window into the ground between five and ten times, though he acknowledged that "[n]o one shot at [him] until [he] shot first and [that he] did not see anyone else with a gun." When someone returned fire, they almost hit him, so the Defendant threw the AK-47 down on the bed, grabbed two pistols and another rifle, and ran out the back door. He said that he later went into the cave to get out of the rain.

At trial, Agent Lott confirmed that the Defendant told him that he was drinking and taking Suboxone in the hours before the incident. However, Agent Lott did not believe that the Defendant appeared to be under the influence at the time he gave his statement. Agent Lott did not test the Defendant for any drugs or alcohol in his system.

Agent Lott also interviewed Brandy, who reported that the Defendant went to the store on the day of the offense and bought three large beers and one "Smirnoff beer." Brandy opined to Agent Lott that she thought the Defendant was drunk at the time of the shooting.

Agent Lott also obtained a recording of a December 22, 2015 phone call that the Defendant placed to his father from the jail while awaiting trial. Parts of the call were played for the jury. During that phone call, the Defendant reported that he had been drinking on the day of the offense, though the Defendant later clarified, "I had three beers, that's all I had, you know I wasn't f--king drunk." The Defendant also averred, "They [were] feeding me Xanax and s--t." The Defendant explained to his father that he went into the kitchen to get his last beer when he and Jack got into an argument. According to the Defendant, after that, Jack began carrying a pistol around in his pocket, so the Defendant went to retrieve his gun, which he showed to Jack and said, "I've got one too."

The Defendant asserted that Jack had called the authorities after they argued. The Defendant said that he was sitting in his bedroom listening to the radio when "three law

dogs" showed up at the mobile home. The Defendant conveyed that Jack told the officers that the Defendant had a gun, and the Defendant insisted that the officers shot first. The Defendant told his father that he "unloaded one of them godd--n AKs on their a-s," and he exclaimed, "I shot at the godd--n law." The Defendant said that he shot approximately thirty rounds at the officers and that he ran out the back door after the officers shot into the window as he tried to reload. When the Defendant's father mentioned being found not guilty by reason of insanity, the Defendant stated, "I've told them I'm crazy as hell. I've been acting crazy as hell. . . . I've about jumped on everyone in this godd--n jail, guards and all."

Agent Lott confirmed that he received a December 29, 2015 document entitled "Frontier Health Crisis Intervention and Consultation Assessment Form." According to the form, the Defendant reported that at the time of the Defendant's arrest, he had recently ingested Suboxone, Xanax, marijuana, and alcohol and that he was unsure what happened. The form further indicated that after the Defendant's arrest and incarceration, the Defendant suffered from delirium tremens, cravings, night sweats, diarrhea, headaches, insomnia, nausea, and vomiting.

That concluded the State's proof. The defense then called several witnesses.

The Defendant's first witness was Franchesca Shoun, a nurse who worked with the Carter County Sheriff's Office. Ms. Shoun testified that she signed a medical form indicating that the Defendant was prescribed various medications consistent with a protocol that a healthcare provider followed for inmates experiencing withdrawal.

Next, the defense called Sergeant Brian McGinnis, a shift sergeant at the Carter County Jail. Sergeant McGinnis confirmed that the jail screened the Defendant for drugs on December 17, 2015, following the Defendant's arrest. The Defendant's urinalysis drug test indicated that the Defendant was positive for benzodiazepines, Suboxone, and marijuana.

The thirty-nine-year-old Defendant testified in his own defense. He told the jury about his long history of abusing alcohol and drugs since he was a teenager in North Carolina, which included abusing pain pills starting when he was about thirty years old. The Defendant admitted that when he moved to Carter County, Tennessee, he started going to a clinic to receive Suboxone to treat his addiction problems, that the Suboxone made him "feel good" like a "generic high or something," and that if he did not use it, he would experience withdrawals. He testified that he was also required by the clinic to attend one to two recovery classes a month and that he complied with this requirement. According to the Defendant, he only had been taking Suboxone about four or five months before the shooting happened, but he acknowledged that he eventually began to snort it.

The Defendant indicated that it was "okay" having Jack and Kayla living in the mobile home, though it was crowded. The Defendant averred that at the time of the shooting, he was upset with Jack because Jack was using the couple's money to buy drugs instead of having their electricity restored and returning home.

The Defendant remembered that the day before the incident, December 15, 2015, he and Jack went to a local mobile home park to buy Xanax. The Defendant described some of the details regarding the route they took to the mobile home park, Jack's calling the dealer, the dealer's getting into the car, and Jack's buying forty Xanax "bar[s]" with money the Defendant had loaned him. The Defendant, who had already been drinking that day, remembered that he took some Xanax during the car ride home. He said that once home, he drank a couple more beers and snorted some Xanax before he "passed out" for the night, though he could not recall if he slept much. The Defendant estimated that he woke up around 11 a.m. on December 16, that he felt ill, and that he began drinking large beers and taking more Xanax. According to the Defendant, in the hours after waking, he consumed two or three twenty-five-ounce beers and both snorted and swallowed Xanax. The Defendant said that when the beer ran out, he went to the store and purchased three or four more; he indicated that on the way home, the Xanax started to "kick[] in," which made him sleepy, and that he almost ran off the road. The Defendant averred that he started "losing memory" after returning home, though he remembered that he then drank more beer, drank a forty-ounce vodka and orange juice drink, smoked marijuana, and snorted more Xanax.

The Defendant maintained that after snorting Xanax, he went into the kitchen to get a beer and that Jack said, "That's all he cares about is that damn beer." The Defendant believed that he "said something back to" Jack. Though the Defendant still claimed to be unsure of any details, he recalled that after he exchanged words with Jack, he returned to his bedroom and started drinking more beer, listening to the radio, and cleaning one of his guns. The Defendant confirmed that at the time of this incident, he owned several guns, including an AK-47, an SKS rifle, a .45-caliber rifle, and two .22-caliber handguns; all of which he kept in the locked bedroom closet.

The Defendant said he was in the bedroom cleaning his AK-47 when Brandy came into the room. He did not remember breaking a fan or putting a gun in his mouth, facts to which Brandy testified, but he was able to recall pulling out one of his .22-caliber handguns because Brandy and Jack were trying to take the AK-47 from him. The Defendant acknowledged that he may have pointed the pistol at Brandy and Jack believing that Jack had likely entered the bedroom and pulled a pistol from his pants. The Defendant remembered feeling threatened by Jack, and the Defendant explained that "[b]etween the alcohol and the drugs," the Defendant was "fearing for [his] life now." Ultimately, Jack and Brandy left the bedroom, though the Defendant did not know where they went.

The Defendant thought that at some point, he heard Brandy say "[c]ome out or they're going to shoot you," which "scared [him] to death." Upon looking out the window, the Defendant saw the Dodge Charger, though he claimed that he "didn't know it was a cop car at the time." The Defendant explained, "I guess I panicked. . . I put the clip in the gun and I shot out the window. I know I started shooting in the ground[.]" The Defendant remembered, "I did shoot in the ground and I guess, I guess I shot all around and up in the air." After firing the shots through "a hole in the screen," the Defendant threw the AK-47 on the bed and ran out the back door of the house before hiding in the nearby cave where he was eventually apprehended. According to the Defendant, as he started sobering up, he realized that he "had emptied the gun," meaning that he had fired more rounds than the initial five to ten he remembered. The Defendant had no recollection of how the SKS got out of the closet or firing the SKS. He also had no memory of turning the bedroom light on or off, but he did not deny that he might have done so.

The Defendant insisted that he feared for his life when he shot out the window because Jack had pulled a gun on him and he thought Jack's friends were there to "jump on [him]" or kill him, especially in light of Brandy's comment to come out or that someone was going to shoot him. The Defendant also acknowledged that he figured the Dodge Charger "was the law," though none of the events were clear in his mind. The Defendant asserted that he never planned anything or aimed at anybody. The Defendant averred that the TBI missed two fully loaded clips[3] that were inside the bedroom. He indicated that if he had wanted to reload, he could have.

The Defendant said that his "nightmare" began once he was arrested. The Defendant indicated that though he had sobered up some by the time he was interviewed, he sounded "half drunk" on the recording, and he believed that he was still "a little bit" high and "had a buzz" at that time. The Defendant conceded telling Agent Lott that he thought the law had been called and was there for him; however, the Defendant insisted it was not clear either way and that he did not know what was happening. The Defendant confirmed that he was given detox medicines once he was incarcerated, and he asserted that he was experiencing withdrawals and was suicidal at the time he made the phone call to his father.

Brandy was recalled as a witness. She confirmed that she found two clips in the bedroom after the offense, which she later sold to a pawn shop. However, according to Brandy, one clip was possibly empty, and the other might have contained ten or fewer bullets.

Finally, the Defendant called Dr. Jonathan Lipman, an expert in forensic neuropharmacology. Dr. Lipman testified that he had reviewed the Defendant's complete

---

[3] At one time, the Defendant stated three.

- 11 -

file, as well as listening to all the witnesses at trial, and that he concluded that the Defendant was intoxicated at the time of the offense due to his use of Xanax, Suboxone, alcohol, and marijuana. Dr. Lipman explained how the different drugs the Defendant was taking that night worked together, how they would have interacted to cause the Defendant's "profound intoxication," and how they might have impaired the Defendant's memory.

Dr. Lipman also told the jury that some people experience rage when taking benzodiazepines and were vulnerable to provocation. Ultimately, Dr. Lipman testified that the substances the Defendant ingested before the incident on December 16, 2015, were neuropsychologically impairing, meaning they had the potential to affect the Defendant's judgment. Dr. Lipman also agreed that the Defendant's medical records reflected he was experiencing withdrawal at the time the Defendant made the jail phone call to his father.

Following the arguments of the parties, the jury was charged. Relative to the possessing or employing a firearm during the commission of or attempt to commit a dangerous felony, the trial court charged as follows:

> Unlawful possession of a firearm during the commission of or attempt to commit a dangerous offense.
> Any person who possesses a firearm during the commission of or attempt to commit a dangerous felony is guilty of a crime. For you to find the [D]efendant guilty of this offense the State must have proven beyond a reasonable doubt the existence of the following essential elements:
> (1) That the [D]efendant possessed a firearm; and
>
> (2) That the possession was with the intent to go armed during the commission of or attempt to commit attempted first-degree murder, attempted second-degree murder or attempted voluntary manslaughter.
> . . . .
> And (3) that the [D]efendant acted intentionally.[4]

Thereafter, the jury found the Defendant guilty as charged of seven counts of attempted first-degree murder and seven counts of possession of a firearm during the commission of or attempt to commit a dangerous felony.

A sentencing hearing was held on May 17, 2019. The trial court admitted into evidence the presentence report, the STRONG-R assessment, the Defendant's medical

---

[4] As charged, this offense is unlawful <u>possession</u> a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony, which is a Class D felony. <u>See</u> Tenn. Code Ann. § 39-17-1324(a), (g)(1). We note that the jury verdict forms also state possession of a firearm, not employment.

records, the forensic evaluation report assessing the Defendant's competency to stand trial, and Dr. Lipman's supplement to his trial testimony. The presentence report reflected that as a teenager, the Defendant had two driving while impaired convictions and a conviction for public intoxication. The STRONG-R assessment showed that the Defendant was at moderate risk for re-offense. The Defendant's medical records, the forensic evaluation report, and the supplement to Dr. Lipman's testimony detailed the Defendant's childhood trauma, his record of drug and alcohol addiction, and his history of depression and suicide attempts.

The Defendant testified that he was from North Carolina. He detailed his upbringing, informing the trial court that he grew up with his brother, father, and great-grandmother and that his mother left when he was two years old. The Defendant said that he had only seen his mother "a couple times" after she left. The Defendant recollected that on one occasion when he was around eight years old, his mother, who had been drinking, took him to a pizza restaurant and that they left without paying; she was arrested shortly thereafter. The Defendant recalled another occasion when he was about thirteen or fourteen years old when his mother came to the house drunk; she wanted to take the Defendant with her, but the Defendant's father refused. The Defendant reported that the last time he saw his mother was in 2014 when she was dying from cancer; she died about a month later. Relative to his father, the Defendant said that they had a "pretty good" relationship except for when his father drank and would beat him and his brother, which happened every couple of days. The Defendant recalled that his father was a life-long drinker, had approximately twenty-five to thirty DUIs, regularly used marijuana and cocaine, and was constantly in legal trouble; the Defendant's father had died by the time of the sentencing hearing. Relative to his great-grandmother, she primarily raised the Defendant and his brother, providing for their needs, but she became sick and had to be moved into a nursing home; she died when the Defendant was fourteen or fifteen years old. The Defendant explained that after his great-grandmother was placed in the nursing home, he spent a lot of time alone, and he stopped attending school regularly and got in trouble for truancy.

The Defendant also testified that he was a survivor of sexual abuse, his being abused by two different men during his adolescence and teenage years. According to the Defendant, he was abused by an adult family friend multiple times when he was eight or nine years old. The Defendant recalled visiting the man's home with his brother, smoking marijuana with the man, and receiving gifts from the man. The Defendant also recalled that he was between eleven and thirteen years of age when he began being abused by an older friend, explaining that he spent time at this person's house to get away from his father; the sexual abuse by this man lasted several years.

The Defendant reiterated his history of substance abuse. According to the Defendant, he began drinking and smoking marijuana at an early age. The Defendant stated that his disease progressed quickly and that he used crack cocaine for the first time when he was fourteen or fifteen years old; he obtained the crack cocaine from his father, who had left it in the bedroom. The Defendant said that he had used crack cocaine regularly since his twentieth birthday.

The Defendant testified that he dropped out of high school in the tenth grade, but he often worked multiple jobs. The Defendant stated that he met Brandy when he was approximately nineteen years old, that she was eighteen years old, and that they lived together until the time of the offense. The Defendant further indicated that he had tried to commit suicide numerous times, including two times when he was hospitalized for cutting his wrists. According to the Defendant, he had been on and off anti-depressants his entire life. The Defendant had also been court-ordered to attend "alcohol assessment classes," and he attended twenty classes at Catawba Mental Health.

The Defendant apologized to Deputy Markland and Brandy, as well as to "everyone involved," claiming that he "never meant for this to happen" and wished he "could take it back." When asked why he committed the offense, the Defendant testified, "I can't figure it out. It's just the alcohol and the drug mixture run [sic] me crazy, put me over the edge, whatever you want to say." When asked whether he had ever been physically violent with someone, the Defendant said that he had "been in a couple of fights but nothing major."

After hearing and reviewing the proof, the trial court determined that the Defendant was a Range I, standard offender. The trial court also addressed the enhancement and mitigating factors. Though the trial court found that enhancement factor (9) of Tennessee Code Annotated section 40-35-114 arguably applied—that the Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community,[5] it gave that factor "little weight." Relative to mitigating factors under Tennessee Code Annotated section 40-35-113, the trial court found several present. Specifically, the trial court gave "some consideration" to factor (3)—that substantial grounds exist tending to excuse or justify the Defendant's criminal conduct, though failing to establish a defense; gave "a limited amount of consideration" to factor (8)—that the Defendant was suffering from a mental or physical condition that significantly reduced his

---

[5] The presentence report reflected that in 1995 when the Defendant was sixteen years old, he failed to comply with his supervised probation for one of his convictions for driving while impaired.

culpability for the offense[6]; and gave "some weight" to factor (13), the catch-all factor, based on Dr. Lipman's testimony and report and the Defendant's "very sad life," "sorry" parents and friends, sexual abuse, drug and alcohol abuse, and a "lack of family structure."[7]

The trial court ordered the Defendant to serve fifteen years on each of the seven attempted first-degree murder convictions. Relative to the seven counts involving a firearm, the trial court stated that these were convictions for employing a firearm during the commission of or attempt to commit a dangerous felony, which are Class C felonies, see Tennessee Code Annotated section 39-17-1324(b), (h)(1), and sentenced the Defendant to serve six years on each count. The trial court noted that a six-year sentence was the "mandatory minimum" for such a conviction and had to be served at one hundred percent. See Tenn. Code Ann. § 39-17-1324(h)(1).

Thereafter, the trial court considered consecutive sentencing. Relative to consecutive sentencing, the trial court noted that the employment sentences must be served consecutively to the effective sentence for the underlying felonies. See Tenn. Code Ann. § 39-17-1324(e)(1). Regarding the attempted first-degree murder convictions, the trial court found that Tennessee Code Annotated section 40-35-115(b)(4)—that the Defendant was a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high—applied and justified imposing additional consecutive sentences. The trial court recognized that in applying the dangerous offender criterion, it was required to make the additional findings required by State v. Wilkerson, 905 S.W.3d 939 (Tenn. 1995), and outlined those findings on the record.

Ultimately, the trial court ordered the fifteen-year, attempted first-degree murder sentences imposed for Counts 1, 3,[8] and Count 5 to be served consecutively to one another and the remaining fifteen-year sentences in Counts 7, 9, 11, and 13 to be served concurrently with the sentence in Count 3. The court also ordered all seven counts of the six-year, employing a firearm sentences to be served concurrently to each other, but consecutively to the forty-five-year sentence imposed for the attempted murder convictions, which resulted in an effective fifty-one-year sentence.

---

[6] Noting that this factor specifically states that voluntary intoxication does not fall within its purview, the trial court did not consider the Defendant's drug and alcohol usage in applying this factor but instead "from the history" that had been presented at the hearing.

[7] At the conclusion of its ruling, the trial court stated that it had applied no enhancement factors and two mitigating factors.

[8] The conviction in Count 3 involved Deputy Markland and required a release eligibility of eighty-five percent due to the serious bodily injury she sustained. See Tenn. Code Ann. § 40-35-501(k)(5). All of the other attempted murder convictions only required a release eligibility of thirty percent.

Thereafter, the Defendant filed a timely motion for new trial, which was denied. This appeal followed.

ANALYSIS

On appeal, the Defendant contends that there was insufficient evidence to support premeditation for his attempted first-degree murder convictions, that the trial court erred by imposing partial consecutive sentences relying on the dangerous offender criterion, and that the trial court erred in imposing Class C felony convictions for employing a firearm during the commission of or attempt to commit a dangerous felony when he was convicted only of possessing such a firearm, a Class D felony. We will address each issue in turn.

*I. Sufficiency of the Evidence*

The Defendant contends that the evidence adduced at trial was insufficient to support his convictions for attempted first-degree murder, specifically, challenging the element of premeditation. The Defendant submits, instead, that his acts were a result of intoxication, stress, and mental illness. In support of his argument, the Defendant cites to (1) testimony from Brandy, Jack, and Greg that the Defendant was intoxicated, crazy, out of character, or all three; (2) testimony from his expert Dr. Lipman that the Defendant was intoxicated at the time of the shooting; and (3) testimony from Ms. Shoun and Sergeant McGinnis that the Defendant was withdrawing from drugs following his arrest. The State responds that based upon all of the evidence presented, the element of premeditation was sufficiently established.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Bland</u>, 958 S.W.2d at 659; <u>see also</u> <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." <u>State v. Cooper</u>, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the

- 16 -

State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference[.]" Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As charged here, "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(2). Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541

(Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors determining the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include the lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). "Tennessee cases have long recognized that premeditation may be proved by circumstantial evidence" because "premeditation involves the defendant's state of mind, concerning which there is often no direct evidence." Davidson, 121 S.W.3d at 614-15.

The Defendant argues that he was so intoxicated that he was incapable of premeditation. While voluntary "intoxication itself is not a defense to prosecution for an offense," it "is admissible in evidence, if it is relevant to negate a culpable mental state." Tenn. Code Ann. § 39-11-503(a). Whether the defendant's intoxication negated his ability to premeditate and form the intent to kill were questions for the jury to consider and resolve. State v. Vaughn, 279 S.W.3d 584, 602 (Tenn. Crim. App. 2008).

In this case, the Defendant does not contest the sufficiency of the convicting evidence as to the non-mens rea elements of the offense. He argues that he could not form the requisite specific intent to commit the offenses due to his alleged intoxication. Jack stated that the Defendant seemed normal that evening before the incident in question took place. Most importantly, the Defendant by his own admissions stated that he was not drunk when he fired the shots, first, stating so during the interview with Agent Lott, and again, on the jail call with his father. The jury was able to hear both of those recordings. The jury was instructed on voluntary intoxication but rejected the Defendant's claim, as was its prerogative.

We find the proof, in the light most favorable to the State, sufficient to establish that the Defendant premeditatedly and intentionally attempted to kill the victims. Specifically, relative to premeditation, the Defendant declared an intent to kill Brandy when he pointed a handgun at her head inside their bedroom; the Defendant indicated on the jail call that he knew it was the police at the mobile home and that he had "unloaded one of them godd--n AKs on their a-s"; he procured a second rifle from his closet and prepared for the shooting by turning the bedroom lights off and on and positioning his semi-automatic weapons; he used two different rifles to shoot at the victims at least fifty-two times; he emptied the clips from both rifles; he made impact with all three police vehicles, resulting in a total of at

- 18 -

least seventeen impact sites, as well as hitting Brandy and Deputy Markland and firing near both Michael and Greg; and he left and went to hide in a nearby cave when Sergeant Lunceford returned fire. Despite the Defendant's claims to the contrary, there was no evidence that he was provoked; the police officers had just arrived on the scene. Therefore, the Defendant's challenge to the sufficiency of the evidence fails, and he is not entitled to relief on this issue.

## II. Consecutive Sentencing

The Defendant argues that consecutive sentencing was unwarranted under the dangerous offender criterion in Tennessee Code Annotated section 40-35-115(b)(4). According to the Defendant, the trial court merely recited the Wilkerson factors and engaged in only a perfunctory analysis, and when undertaking the appropriate Wilkerson analysis, consecutive sentencing was not supported by the record. The State argues that the trial court properly analyzed the Wilkerson factors and that consecutive sentencing was warranted.

A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in Tennessee Code Annotated section 40-35-115(b). "Any one of these grounds is a sufficient basis for the imposition of consecutive sentences." State v. Pollard, 432 S.W.3d 851, 862 (Tenn. 2013) (citing State v. Dickson, 413 S.W.3d 735, 748 (Tenn. 2013)). Additionally, when the imposition of consecutive sentences is based on application of the dangerous offender criterion, the court must make specific findings that that the aggregate sentence is "reasonably related to the severity of the offenses committed" and "necessary in order to protect the public from further criminal acts." State v. Wilkerson, 905 S.W.2d 938, 939 (Tenn. 1995); see also Pollard, 432 S.W.3d at 863-64; State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

Furthermore, our supreme court has held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." Pollard, 432 S.W.3d at 860. This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." Id. at 861. "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. (citing Tenn. R. Crim. P. 32(c)(1); State v. Bise, 380 S.W.3d 682, 705 (Tenn. 2012)). However, when imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve

- 19 -

the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002).

Here, in classifying the Defendant as a dangerous offender, the trial court recognized its obligation to consider the Wilkerson factors and listed those factors on the record. The trial court also noted that if it did not order any consecutive service of the attempted first-degree murder sentences, then the Defendant faced a twenty-one-year sentence, whereas if all sentences were ordered to be served consecutively, then the Defendant faced 147 years. The trial court then proceeded to detail the evidence at trial. First, the trial court noted that the Defendant told Brandy he would kill her and that "[t]he law better not be coming." The trial court found it important that the Defendant used two semi-automatic weapons, emptied both clips, and fired at least fifty-two times. The "most troubling thing" for the trial court was that the Defendant called his father while in jail and said that he shot at the "f--king cops," that here came "three law dogs and [he] shot at them," that he "unloaded one of the f--king AK-47s on their a-s," and that he was trying to reload but they were firing back so he ran out the door. The trial court further observed that the Defendant said during the call that though he was "acting crazy," he had "only drank three beers and wasn't drunk."

According to the trial court, the Defendant's statements during the jail call were contrary to the Defendant's claim at the sentencing hearing that he was "suffering from some delusion that this [was] an action that would never repeat itself and d[id] not put people at risk in the future." The court concluded that consecutive sentencing was necessary to protect the public against further criminal conduct by the Defendant and that the offense was aggravated under Wilkerson based upon the evidence presented at trial.

In addition, the trial court determined that confinement for an extended period of time was necessary to protect society from the Defendant's unwillingness to lead a productive life. The trial court acknowledged Brandy's testimony that the Defendant worked hard, but noted that the presentencing report only indicated "[hap]-hazard jobs here and there" and that the Defendant's own testimony was that he drank, smoked marijuana, and took pills, and then replaced the pills with Suboxone. The trial court concluded that the Defendant's job history and statements reflected an anti-social lifestyle, which led to the Defendant's resorting to criminal activity, that the officers were not a threat when they arrived on the scene, and that the Defendant unloaded his guns on the officers even though they were there to help him.

The trial court then found that the aggregate length of the effective sentence, fifty-one years, was reasonably related to the offenses for which the Defendant stood convicted. The trial court commented that an aggregate sentence of 147 years would be inappropriate and would fail to take into account the principles of sentencing.

Contrary the Defendant's assertion, we find that trial court here did much more than merely recite the <u>Wilkerson</u> factors for the record without further analysis. The trial court explicitly found the circumstances of the offenses aggravated, an extended period of confinement necessary to protect society, and the aggregate length of the Defendant's sentences reasonably related to the serious nature of the offenses. We conclude that the trial court properly articulated its reasons for ordering consecutive sentences and that in so doing, the trial court gave due consideration to the <u>Wilkerson</u> factors; therefore, its sentencing decision is presumed reasonable. Moreover, the trial court's findings are supported by the record. Accordingly, we conclude that the trial court did not abuse its discretion by classifying the Defendant as a dangerous offender. The trial court's consecutive sentencing decision is affirmed.

### III. Employing/Possession Convictions

The Defendant argues that the trial court committed plain error when it entered judgments of conviction and sentences reflecting that the Defendant was guilty of seven counts of employing a firearm during the commission of or attempt to commit a dangerous felony, a Class C felony. The Defendant notes that the jury was instructed and found the Defendant guilty of possession of firearm during the commission of or attempt to commit a dangerous felony, a Class D felony, not employment. The State concedes error, and we agree.

At stake in this case are constitutional protections of paramount importance: the Fourteenth Amendment's proscription of any deprivation of liberty without "due process of law," and the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." Taken together, these rights indisputably entitle a criminal defendant to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." <u>United States v. Gaudin</u>, 515 U.S. 506, 510 (1995); <u>see also</u> <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 278 (1993); <u>In re Winship</u>, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"). Trial by jury has been understood to require that "the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours[.]" <u>Gaudin</u>, 515 U.S. at 510 (citing 4 W. Blackstone, <u>Commentaries on the Laws of England</u> 343 (1769)).

Though we do not think that the trial court's actions in this case were intentional and that trial court simply misspoke at the sentencing hearing, likely due to the confusing language of the indictment that used both the words possessing and employing, these basic constitutional principles clearly apply in this situation. The trial court committed structural constitutional error when it sentenced the Defendant for a different, greater offense than

what was charged to and found by the jury. Moreover, all five of the factors for plain error relief are satisfied under these circumstances. See State v. Vance, 596 S.W.3d 229, 252-254 (Tenn. 2020) (applying plain error analysis to a defendant's constitutional claims); see also State v. Franklin, 585 S.W.3d 431, 471-77 (Tenn. Crim. App. 2019) (finding plain error relief warranted after determining that a defendant had established structural constitutional error).

We find it unnecessary to remand these convictions to the trial court for resentencing. See, e.g., State v. Angela Manning, No. 03C01-9501-CR-00012, 1998 WL 103317, at *15-16 (Tenn. Crim. App. Feb. 27, 1998) (concluding that a remand for sentencing on modified conviction unnecessary if record was sufficient for the appellate court to impose an appropriate sentence). When sentencing the Defendant for the Class C felony convictions, the trial court imposed the mandatory minimum sentence of six years. Because the trial court's intent was clear, we impose the mandatory minimum sentence of three years for the Defendant's unlawful possession convictions. See Tenn. Code Ann. § 39-17-1324(g)(1). Accordingly, the sentences of six years are vacated and remanded. The trial court is instructed to enter convictions and judgment forms for Class D felony possession of a firearm during the commission of or attempt to commit a dangerous felony pursuant to Tennessee Code Annotated section 39-17-1324(a), rather than an employment Class C felony offense under subsection (b). The mandatory minimum sentence of three years is to be imposed for these convictions. Moreover, we note that the judgment forms for these convictions did not place the six years in the section noting mandatory minimums. Upon remand, the new judgment forms should place the three-year sentence in the appropriate mandatory minimum section. Finally, we observe that the trial court's consecutive sentencing remains unchanged, and as such, an effective forty-eight-year sentence results.

## CONCLUSION

For these reasons, we vacate the judgment forms that improperly reflect convictions and sentences for employment of a firearm during the commission of or attempt to commit a dangerous felony. The case is remanded for the entry of corrected judgment forms to reflect Class D felony possession of a firearm during the commission of or attempt to commit a dangerous felony convictions and the corresponding mandatory minimum sentences of three years for each count. In all other respects, the convictions and judgments are affirmed.

_____

D. KELLY THOMAS, JR., JUDGE

- 22 -